**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Micol Petty, | No. CV-18-00567-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Circle K Stores Incorporated, | |
| Defendant. | |

## INTRODUCTION

Plaintiff Micol Petty is a former employee of Defendant Circle K Stores Inc. ("Circle K"). On September 8, 2015, Petty's second-level supervisor, Bill Allsworth, made aggressive sexual overtures toward her while they were inside a walk-in cooler in a Circle K store. Petty rebuffed the overtures and reported the incident to a different supervisor soon after it was over. Circle K responded by immediately conducting an internal investigation and then firing Allsworth. Petty kept working for Circle K for nine months after Allsworth's termination, then resigned. In this lawsuit, Petty asserts a Title VII claim for sex discrimination, as well as various state-law claims.

Now pending before the Court is Circle K's motion for partial summary judgment. For the following reasons, that motion will be granted in part and denied in part.

…

…

…

# BACKGROUND

I.   <u>Factual Background</u>

Unless otherwise indicated, the following facts are not in dispute:

### A.   **Petty's Hiring And Company Policies**

Petty began working for Circle K in February 2015. (Doc. 88-2 at 69.) In May 2015, she was promoted to store assistant. (*Id*. at 21, 71.) In that role, her responsibilities included working the cash register, balancing the store's books, taking deposits to the bank, and auditing the store's inventory. (Doc. 89-2 at 19, 22.) Petty's immediate supervisor was Kim Wyant, the store manager. (Doc. 88-2 at 17, Doc. 88-3 at 8.) Wyant reported to Allsworth, the market manager, who stopped by Petty's store multiple times each week. (Doc. 88-2 at 75; Doc. 89-2 at 36.)

At all relevant times, Circle K had policies in place that prohibited sexual harassment and discrimination. (Doc. 88-2 at 9-11.) The company also had procedures in place for responding to and investigating complaints of sexual harassment, and the consequences for violating the policies included termination. (*Id*.)

### B.   **The September 8, 2015 Incident**

In the days before the incident in the cooler, Petty and Allsworth exchanged a series of text messages. (Doc. 88-3 at 86.) Petty sent Allsworth three photographs of herself in a Circle K uniform for use in a company newsletter. (*Id*.) Allsworth responded, "That first one is sweet, very flirty. Hope that doesn't offend you," to which Petty responded, "No it does not :) haha but thank you.. blush blush." (*Id*.) Allsworth later texted Petty, "Feel free to send me another one without the uniform," and Petty later responded, upon further urging, with additional photographs of herself wearing a tank top. (*Id*.) Additionally, Allsworth asked Petty, "This is probably way inappropriate…do you date older guys," and Petty responded, "No your [sic] totally fine (: no worries, & yes I do." (*Id*.)

On September 8, 2015, at around 3:00 pm, Allsworth visited Petty's store. (Doc. 88-2 at 23; Doc. 88-3 at 8.) At Allsworth's direction, the two of them entered the store's walk-in cooler. (*Id.*)

Petty contends—and her account of the incident is all that matters for summary judgment purposes, even though it is disputed by Allsworth—that as soon as the door closed, Allsworth told her, "I would love to see you bent over my knees." (Doc. 88-2 at 26.) He professed his love for her, told her she didn't know how long he'd been watching her, and said he would "trade [his] wife for [her] any day." (*Id*. at 26-27.) He tried to kiss her, and when she tried to leave, he closed the door, pushed her in the chest, grabbed her by the arm and waist, and prevented her from leaving. (Doc. 88-2 at 26-27; Doc. 88-3 at 58.) Petty yelled for help and kept telling him she wanted to leave. Eventually, the cashier on duty buzzed to indicate she needed help at the register, at which point Allsworth allowed Petty to exit. (Doc. 88-2 at 27-28.) The entire encounter lasted "[n]o more than five minutes." (*Id*. at 26.)

C.     **Circle K's Response To The September 8, 2015 Incident**

The immediate aftermath of this incident is not in dispute. Shortly after Allsworth left the store, Petty, in tears, called Wyant to report the incident. (Doc. 88-2 at 28.) Wyant called Joel Konicke, another market manager, who called Allsworth's supervisor, Kristin Krusemark. (Doc. 88-2 at 77-78; Doc. 88-3 at 31.) Later that day, Krusemark told Allsworth not to have any contact with store employees. (Doc. 88-3 at 14-15.)

Allsworth had texted Petty that afternoon after leaving the store, stating "I think your [sic] a beautiful woman I would like to get to know personally and intimately. I think professionally you're a very good [Store Assistant], with potential to become a manager within a year or so…. but that has nothing to do with the former." (*Id*. at 64.) Allsworth followed up by saying, "I do not see you as a piece of 'ass' to use and push aside." (*Id*. at 65.) This was the last contact between Allsworth and Petty. (*Id*. at 16.)

On September 9, 2015, Circle K placed Allsworth on unpaid administrative leave pending investigation of the allegations. (Doc. 88-3 at 17-18.) Allsworth was told not to have any contact with Circle K employees. (*Id*. at 18.)

On or around September 16, 2015, Circle K terminated Allsworth. (Doc. 88-3 at 18, 94.)

On September 17, 2015, Petty filed a charge with the Equal Employment Opportunity Commission ("EEOC"). (Doc. 89-4 at 2-4.)

On September 18, 2015, Baldev Bhogal, a Circle K human resources manager, informed Petty via letter that Circle K's investigation had concluded. (Doc. 88-3 at 92.) The letter stated in pertinent part "[t]hough we [Circle K] would not confirm all of your allegations, it does appear that inappropriate behavior and violations of company policy took place." (*Id.*) The letter further stated that, "[a]lthough privacy considerations limited our ability to share confidential information with you about other employees, I can tell you that appropriate action has been taken to ensure that such conduct does not repeat itself." (*Id.*)

### D. Alleged Retaliation By Circle K

Petty contends that, in the months following the incident and her filing of the EEOC charge, Circle K retaliated against her. Specifically, Petty contends she was put on the graveyard shift, saw her hours reduced, and was removed from consideration for promotion. (Doc. 89 at 93-94, 147.) Wyant, however, testified during her deposition that Petty asked for the graveyard shift and asked to postpone entry into the manager-in-training program. (Doc. 92-1 at 3-4.)

On June 8, 2016, Petty informed Wyant (via a Facebook message) that she would not be coming back to work. (Doc. 88-3 at 96.)

### E. Petty's Post-Circle K Employment

Following her departure from Circle K, Petty did not work or apply for another job for six to eight months.[1] (Doc. 89-2 at 113.) Petty testified that she was not mentally ready to work because of the incident in the cooler and that this incident caused problems with her marriage. (*Id.*)

---

[1] Petty's response to Circle K's motion states that "evidence is properly before the Court that Plaintiff sought employment, working part-time cleaning houses." However, Petty's response fails to identify where the Court might go about locating such evidence. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . ."); S. Gensler, 2 Federal Rules of Civil Procedure, Rules and Commentary, Rule 56, at 160 (2018) ("The court has no duty to search the record to identify the facts that might . . . defeat summary judgment.").

On November 19, 2016, Petty was hired at Wal-Mart. (Doc. 88-3 at 105.) On December 18, 2016, Petty was terminated by Wal-Mart for job abandonment. (*Id*.)

On April 14, 2017, Petty was hired by U-Haul. (Doc. 88-3 at 109.) On June 2, 2017, Petty was terminated for failing to show up. (*Id*. at 110.)

On November 22, 2017, the EEOC issued Petty a Right to Sue letter. (Doc. 1 at 4.)

II.    Procedural Background

On February 20, 2018, Petty initiated this lawsuit by filing a complaint against Circle K, Allsworth, and Alimentation Couche-Tard, d/b/a Couche-Tard Brands and Financing, LLC. (Doc. 1.)[2] The complaint asserts three causes of action: (1) a Title VII claim for sexual harassment (*id.* ¶¶ 20-41); (2) a state-law claim for negligence (*id.* ¶¶ 42-47); and (3) a state-law claim for "intentional and/or negligent infliction of emotional distress" (*id.* ¶¶ 48-51).

On June 21, 2018, Allsworth filed a motion to dismiss. (Doc. 23.)

On June 22, 2018, Circle K answered Petty's complaint. (Doc. 24.) The same day, Circle K filed a motion to dismiss Couche-Tard Brands and Financing, LLC. (Doc. 25.)

On July 31, 2018, Petty filed a notice dismissing Alimentation Couche-Tard. (Doc. 37.)

On August 1, 2018, the Court dismissed Alimentation Couche-Tard. (Doc. 39.) The next day, the Court dismissed Allsworth. (Doc. 40.) And the day after that, the Court dismissed Couche-Tard Brands and Financing, LLC. (Doc. 41.)

On October 31, 2018, the case was reassigned from the originally-assigned judge to the undersigned judge. (Doc. 61.)

On June 3, 2019, Circle K filed a motion for partial summary judgment. (Doc. 88.)

On July 3, 2019, Petty filed a response to Circle K's motion. (Doc. 89.)

On July 25, 2019, Circle K filed a reply. (Doc. 92.)

On January 28, 2020, the Court issued a tentative order. (Doc. 94.)

---

[2]    The Court later ordered the Clerk to amend the docket to reflect that Alimentation Couche-Tard and Couche-Tard Brands and Financing, LLC are different defendants. (Doc. 39.)

On February 6, 2020, the Court issued an order authorizing the parties to file supplemental briefs addressing whether Petty may assert a claim for front or back pay if she failed to exhaust her constructive discharge claim. (Doc. 98.)

On February 20, 2020, the parties filed their supplemental briefs. (Docs. 99, 100.)

On March 11, 2020, the Court heard oral argument.

## DISCUSSION

I. <u>Legal Standard</u>

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id*. at 1103.

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "A genuine dispute of material fact exists if 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *United States v. JP Morgan Chase Bank Account No. Ending 8215 in Name of Ladislao V. Samaniego, VL: $ 446,377.36*, 835 F.3d 1159, 1162 (9th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird*, 908 F.3d at 459. Summary judgment is also appropriate against a party who

"fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## II. Scope of the Pending Motion

Circle K has filed a motion for partial summary judgment. Specifically, Circle K is seeking summary judgment on (1) Count One, the Title VII claim premised on allegations of a hostile work environment, quid pro quo harassment, and retaliation (but Circle K is only seeking summary judgment on the "retaliation claim to the extent it arises from [Petty's] resignation"), (2) the portion of Count Three asserting a claim for intentional infliction of emotional distress ("IIED"), and (3) any claim for front and/or back pay arising from the Title VII claim. (Docs. 88, 92.) Thus, Circle K is not seeking summary judgment on (1) the retaliation claim underlying Count One, to the extent it is based on actions taken by Circle K before Petty's departure, (2) Count Two, the negligence claim, and (3) the portion of Count Three asserting a claim for negligent infliction of emotional distress.

## III. Title VII Claim

Although Count One is not a model of clarity, it seems to be asserting a Title VII claim for sex discrimination premised on three different theories: (1) hostile work environment, (2) quid pro quo harassment, and (3) retaliation. Each theory is addressed below.

### A. **Hostile Work Environment**

"Title VII of the Civil Rights Act of 1964 makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 63 (1986) (quoting 42 U.S.C. § 2000e-2(a)(1)). One recognized form of sex discrimination under Title VII is a claim based on "the creation of a hostile work environment that 'is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1161 (9th Cir. 2017)

(quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "A hostile work environment occurs when an employee 1) was subjected to verbal or physical conduct of a sexual nature, 2) this conduct was unwelcome, and 3) this conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Fuller,* 865 F.3d at 1161 (internal quotation omitted).

Circle K moves for summary judgment on Petty's hostile work environment claim for three reasons: (1) the sexual conduct to which Petty was subjected was not "unwelcome," (2) the conduct was not "severe or pervasive," and (3) Circle K is entitled to immunity under the *Ellerth/Faragher* doctrine.

1.     *"Unwelcome"*

To determine whether conduct was unwelcome, courts consider whether the plaintiff "by her conduct indicated that the alleged sexual advances were unwelcome." *Meritor Sav. Bank,* 477 U.S. at 68. However, "[s]ome recipients of sexual advances doubtless have difficulty coming up with a tactful way to refuse them without damaging their ability to get along at work, so unwelcomeness may in some cases be unclear." *E.E.O.C. v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 998 (9th Cir. 2010). Put another way, "[a] plaintiff may appear to participate in sexual conduct without necessarily welcoming that conduct." *Chesier v. On Q Fin. Inc.*, 382 F. Supp. 3d 918, 924 (D. Ariz. 2019). Thus, "the question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact." *Meritor Sav. Bank*, 477 U.S. at 68.

Circle K contends in passing that Petty welcomed the advances of Allsworth, noting that the "flirtatious text exchanges" and "suggestive photographs" in the days preceding the encounter "undermine her claim that the alleged conduct was unwelcome." (Doc. 88 at 8.) However, when viewing the evidence in the light most favorable to Petty, the incident in the walk-in cooler was certainly unwelcome: Petty made her lack of interest clear from the outset, tried to escape, was reduced to tears afterward, and promptly reported Allsworth's behavior. There is, to put it mildly, a triable issue of fact as to whether

Allsworth's conduct was unwelcome.

2.     *"Severe or Pervasive"*

"[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Meritor Sav. Bank*, 477 U.S. at 67. "For sexual harassment to be actionable, it must be *sufficiently severe or pervasive* 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Id.* (citation omitted) (emphasis added).

"A working environment is abusive if 'hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position.'" *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1095 (9th Cir. 2008) (citation omitted). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances," which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. 17 at 23. Additionally, "a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Arizona ex rel. Horne v. Geo Grp., Inc.*, 816 F.3d 1189, 1206 (9th Cir. 2016) (citation omitted). "The required level of severity or seriousness 'varies inversely with the pervasiveness or frequency of the conduct.'" *Nichols v. Azteca Rest. Enterprises, Inc.*, 256 F.3d 864, 872 (9th Cir. 2001) (citation omitted). "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted).

Here, as an initial matter, Petty cannot prevail under the "pervasive" prong of the "severe or pervasive" test. Although the text-message exchange between Petty and Allsworth in the days leading up to the encounter in the walk-in cooler provides helpful context for understanding that incident, Petty conceded during her deposition that "[a]side

from the incident on September 8, 2015," there weren't "any other times that [she] felt harassed by Mr. Allsworth." (Doc. 88-2 at 34.) Thus, the hostile work environment claim in this case is premised on a single incident—the encounter in the walk-in cooler. A claim for "pervasive" harassment must be based on more than a single incident. *Cf. Brooks v. City of San Mateo*, 229 F.3d 917, 924 (9th Cir. 2000) (rejecting plaintiff's argument that "each of [her co-worker's] improper touchings constituted a separate incident").[3]

Petty therefore must demonstrate that the harassment she endured was "severe." This requirement was addressed in *Brooks*, a case that "consider[ed] the legal implications of a single, rather unsavory, episode of workplace sexual harassment." 229 F.3d at 921. The plaintiff in *Brooks* was a telephone dispatcher. *Id.* One evening, a co-worker approached the plaintiff in an empty room, "placed his hand on her stomach and commented on its softness and sexiness." *Id.* When the plaintiff tried to push him away, the coworker then cornered her and "forced his hand underneath and sweater and bra to fondle her bare breast." *Id.* When the plaintiff again tried to stop the harassment, the co-worker propositioned her and "approached [her] as if he would fondle her breasts again." *Id.* The plaintiff then escaped and immediately reported the incident to management, which took steps to fire the co-worker following an investigation. *Id.* at 921-22.

Although the Ninth Circuit deemed the co-worker's conduct "highly reprehensible" and found he had "clearly harassed Brooks as she tried to do her job," it affirmed the district court's grant of summary judgment in the employer's favor because the harassment didn't satisfy the "sufficiently severe or pervasive" requirement. *Id.* at 927. In reaching this conclusion, the court declined to resolve "whether a single instance of sexual harassment can ever be sufficient to establish a hostile work environment" but noted that, "[i]f a single incident can ever suffice . . . the incident must be *extremely severe*." *Id.* at 925-26 (emphasis added).[4] The court concluded the harassment endured by Brooks didn't meet

---

[3]      The Court further notes that Petty's response brief doesn't address (let alone dispute) Circle K's contention that "Petty's hostile work environment claim is based solely on her September 8, 2015 encounter with Mr. Ellsworth in the walk-in cooler that lasted approximately five minutes." (Doc. 88 at 7.)

[4]      The *Brooks* court also cited, with approval, an out-of-circuit case in which "a single

- 10 -

this "extremely severe" standard because she "did not allege that she sought or required hospitalization; indeed, she did not suffer any physical injuries at all." *Id.* at 926.

This case is, in nearly all respects, similar to *Brooks*. Like *Brooks*, it involves a single incident, spanning no more than a few minutes, in which an employee was subjected to unwelcome sexual advances by a fellow employee. Like *Brooks*, the conduct was largely verbal, although there was some touching. Like *Brooks*, the touching didn't take the form of slapping, beating, choking, or rape and didn't result in any physical injury or hospitalization. And like *Brooks*, the victim quickly reported the incident after it was over, the employer then conducted an investigation, and the harassing employee was fired.[5]

The one potentially significant difference between this case and *Brooks* is that the harasser here was Petty's supervisor, whereas the harasser in *Brooks* was a co-worker. In *Brooks*, the Ninth Circuit observed in a footnote that "a sexual assault by a supervisor, even on a single occasion, *may well* be sufficiently severe." *Id.* at 927 n.9 (emphasis added). Thus, it is necessary to address whether Allsworth's role as Petty's supervisor is enough, under Ninth Circuit law, to distinguish this case from *Brooks*.

The answer is no. Although the *Brooks* court didn't provide definitive guidance concerning how to address one-off episodes of sexual harassment committed by

---

incident was held to be sufficient" because the plaintiff had been slapped, beaten, hit in the head with a radio, choked with a phone cord, raped, and held captive overnight. *Id.* at 926 (citing *Al-Dabbagh v. Greenpeace, Inc.*, 873 F. Supp. 1105 (N.D. Ill. 1994)).

[5] During oral argument, Petty argued for the first time that, because Allsworth engaged in the spoliation of evidence (*i.e.,* deleting some of the text messages he sent her), the Court should infer that the missing text messages involved particularly offensive statements and rely on this inference to deny summary judgment. This argument is unavailing. First, Petty failed to raise a spoliation claim in her response to Circle K's summary judgment motion, so any such claim is (at least for summary judgment purposes) forfeited. Second, sanctions based on the spoliation of electronically stored information ("ESI"), such as text messages, are available only if, *inter alia*, the missing ESI "cannot be restored or replaced through additional discovery." *See* Fed. R. Civ. P. 37(e). Here, Petty was the person who received the text messages in question, so she had access to the messages—and could have testified about their content—regardless of whether Allsworth deleted them from his phone. *Snider v. Danfoss, LLC*, 2017 WL 2973464, *7 (N.D. Ill. 2017) (denying request for spoliation sanctions under Rule 37(e), based on the defendant's deletion of emails it sent to the plaintiff, because "Plaintiff is obviously a party to the suit and has first-hand knowledge of the substance of emails she sent or received. She is a party who was deposed. She could have been asked about her emails at the deposition, and if the case goes to trial, she can testify as to any emails at that time, assuming the testimony is admissible.").

supervisors, the court did cite, with approval, the Seventh Circuit's decision in *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526 (7th Cir. 1993).[6] Saxton was an engineer who worked for AT&T. On one occasion, her supervisor unexpectedly "placed his hand on Saxton's leg above the knee several times and once rubbed his hand along her upper thigh." *Id.* at 528. Although Saxton removed his hand and told him to stop, he later pulled her into a doorway and kissed her for a few seconds, prompting her to again push him away. *Id.* Three weeks later, during a work-related lunch, the supervisor "suddenly 'lurched' at her from behind some bushes," but she rebuffed the advance. *Id.* During the ensuing hostile work environment lawsuit, the district court granted AT&T's motion for summary judgment and the Seventh Circuit affirmed, holding that "[a]lthough [the supervisor's] conduct was undoubtedly inappropriate, it was not so severe or pervasive as to create an objectively hostile work environment." *Id.* at 534.

The facts of this case resemble the facts of *Saxton*—Petty was subjected to some brief, unwanted touching by her supervisor, who also tried to kiss her. Thus, to the extent *Saxton* serves as a proxy for Ninth Circuit law (and *Brooks* suggests it does), Circle K is entitled to summary judgment on Petty's hostile work environment claim. *See also Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 767-68 (2d Cir. 1998), *abrogated on other grounds by Nat'l R.R. Pass. Corp. v. Morgan*, 536 U.S. 101 (2002) (affirming grant of summary judgment to employer, even though the plaintiff's supervisor "deliberately touched [the plaintiff's] breasts with some papers that he was holding in his hand," because such evidence was not "sufficient to support a finding that she was subjected to abuse of sufficient severity or pervasiveness"); *Burnett v. Tyco Corp.*, 203 F.3d 980, 984-85 (6th Cir. 2000) (affirming grant of summary judgment to employer, even though "there was physical contact" by the supervisor during the underlying incident, because the "single battery" was not "sufficiently severe to create a hostile work environment").[7]

---

[6]     *Brooks*, 229 F.3d at 927 (citing *Saxton* for the proposition that there is "insufficient harassment to constitute a hostile work environment where plaintiff was rubbed and kissed on one occasion, and resisted an attempted groping on another").

[7]     *Cf. Vance v. Ball St. Univ.*, 570 U.S. 421, 424 (2013) (acknowledging that "an employer's liability for [sexual] harassment may depend on the status of the harasser" and

The Court wishes to emphasize that this conclusion "in no way condones [Allsworth's] actions." *Brooks*, 229 F.3d at 927. "Quite the opposite: The conduct of which [Petty] complains was highly reprehensible." *Id.* Nevertheless, as was the case in *Brooks*, "'not all workplace conduct that may be described as harassment affects a term, condition, or privilege of employment within the meaning of Title VII.'" *Id.* (citation omitted).

### 3. *Ellerth/Faragher*

Although, for the reasons stated above, Circle K is entitled to summary judgment on Petty's hostile work environment claim, the Court will briefly address Circle K's final argument concerning this claim: that it is entitled to immunity under the *Ellerth/Faragher* defense. (Doc. 88 at 10-12.)

As background, the general rule is that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher,* 524 U.S. at 807. However, "[w]hen no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." *Id.* To sustain this affirmative defense, which is known as the *Ellerth/Faragher* defense, the employer must show "'(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1055 (9th Cir. 2007) (quoting *Faragher*, 524 U.S. at 807).

Here, the Court need not resolve the applicability of the *Ellerth/Faragher* defense because Petty was not subjected to a hostile work environment. *Cohen-Breen v. Gray Television Group, Inc.*, 661 F. Supp. 2d 1158, 1167 n.3 (D. Nev. 2009) ("[B]ecause

_____

that "different rules apply" when the harasser is a supervisor, but declining to hold that "the employer is strictly liable" for every act of harassment committed by a supervisor).

Plaintiff has failed to present genuine issues of material fact with regard to her hostile work environment claim, Defendant need not rely on the [*Ellerth/Faragher*] affirmative defense."). With that said, the Court will note that the law is unsettled concerning whether that defense is even applicable in a case (such as this case) involving a single incident of harassment where the employer and employee both responded appropriately.

For an employer to satisfy the first prong of the *Ellerth/Faragher* defense, it must establish "both preventive and remedial measures." *Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1185 (9th Cir. 2005). *See also Grissom v. Freeport-McMoran Morenci Inc.*, 2010 WL 3489099, *6 (D. Ariz. 2010) (explaining that this standard requires both the adoption of an anti-harassment policy disseminated to employees and "adequate corrective measures"). Here, Circle K has done so: (1) it provided proof of a policy adopted and disseminated to employees and (2) Allsworth was almost immediately told to refrain from contacting Petty, was suspended without pay the day after the incident, and was terminated shortly thereafter. (Doc. 88-2 at 9-11, 60-61; Doc. 88-3 at 14-15, 17-18, 64, 94.)

As for the second prong, Circle K's position is that "prior to September 8, 2015, Ms. Petty did not report any harassment to her supervisor or any other Circle K employee." (Doc. 88 at 11.) However, by Petty's own admission, the only time she felt harassed by Allsworth was in the walk-in cooler. (Doc. 88-2 at 34.) In other words, before September 8, 2015, there wasn't any harassment for Petty to report. Moreover, Petty didn't unreasonably fail to take advantage of corrective measures—she reported the harassment immediately after Allsworth left the store. (*Id*. at 28.) On the other hand, there's not much Circle K could have done differently after it received Petty's report—its response to the incident was swift and it had no reason to suspect Allsworth was engaging in sexual harassment before it received Petty's complaint. (Doc. 88-3 at 49-50.)

In *McCurdy v. Arkansas State Police*, 375 F.3d 762 (8th Cir. 2004), the Eighth Circuit observed that "the promise of an affirmative defense in single incident cases not involving a tangible employment action [is] illusory—the pragmatic result would be to hold [employers] strictly liable for all single incidents of supervisor harassment, while

allowing other employers an affirmative defense for multiple and ongoing incidents of supervisor harassment." *Id.* at 772. Thus, the Eighth Circuit held that employer-defendants in such cases are entitled to a "modified *Ellerth/Faragher* affirmative defense, despite the . . . inability to prove the second element." *Id.* Other courts, however, have declined to follow the Eighth Circuit's approach. *Chapman v. Carmike Cinemas*, 307 F. App'x 164, 170 (10th Cir. 2009) (declining to modify the affirmative defense and "continu[ing] to require that the employer prove the employee did not promptly report the single-incident offense before the employer may avail itself of the *Ellerth/Faragher* defense").

Unfortunately, the parties' moving papers fail to provide any guidance concerning how the Ninth Circuit would address this issue. Circle K does not cite *McCurdy* in its motion or reply and has not argued the Ninth Circuit follows the same "modified" approach in single-incident cases.[8] Petty, meanwhile, doesn't bother to cite *any* cases in her response to the summary judgment motion—her 17-page brief simply recites and summarizes various facts. Given this backdrop, and in light of Circle K's entitlement to summary judgment on the hostile work environment claim on other grounds, the Court will decline to resolve whether Circle K is entitled to summary judgment under *Ellerth/Faragher*. Resolution of that issue is better left for a future case.

### B. **Quid Pro Quo**

The Title VII claim in Count One can be read as encompassing an allegation of quid pro quo harassment. (Doc. 1 ¶ 22.) Circle K's initial motion did not address this theory, but Petty stated in her response that Allsworth's behavior was "classic *quid pro quo* sexual harassment." (Doc. 89 at 9, italics in original.) Thus, in its reply, Circle K argued that Petty cannot prevail on a quid pro quo theory. (Doc. 92 at 3.)

This sequence creates an initial procedural hurdle. As a general rule, "where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the non-movant an opportunity to respond." *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (alteration omitted). "The rule

---

[8]     According to Westlaw, *McCurdy* has never been cited by the Ninth Circuit.

exists to guard against unfairness and surprise." *Sunburst Minerals, LLC v. Emerald Copper Corp.*, 300 F. Supp. 3d 1056, 1060 (D. Ariz. 2018). However, where arguments in a reply are in response to arguments set forth in an opposition brief, the "arguments are not new; they are rebuttal arguments, which are permitted in a reply brief." *Beckhum v. Hirsch*, 2010 WL 582095, *8 (D. Ariz. 2010). Thus, the Court can and will consider the quid pro quo arguments raised by Circle K.

To prove sexual harassment under a quid pro quo theory, the plaintiff must show that the supervisor "explicitly or implicitly condition[ed] a job, a job benefit, or the absence of a job detriment, upon an employee's acceptance of sexual conduct." *Craig*, 496 F.3d at 1054 (internal quotation omitted). Quid pro quo liability for a supervisor's actions "attaches only if a quid pro quo threat is implemented by some form of sufficiently concrete employment action. An unfulfilled, or inchoate, quid pro quo threat by a supervisor is not enough; something more is required." *Holly D. v. California Inst. of Tech.*, 339 F.3d 1158, 1170 (9th Cir. 2003). "When the request for sexual favors and the conditioning of benefits is implicit, rather than explicit, a plaintiff must show that the supervisor's words or conduct would communicate to a reasonable woman in the employee's position that sexual favors were requested and that such participation is a condition of employment." *De La Torre v. Merck Enterprises, Inc.*, 540 F. Supp. 2d 1066, 1079 (D. Ariz. 2008).

Here, the evidence proffered by Petty, even when viewed in the light most favorable to her, fails to establish a question of material fact sufficient to survive summary judgment. As an initial matter, Petty improperly points to her deposition testimony as proof that Allsworth offered a quid pro quo—she states that "Allsworth informed Plaintiff that he did not 'consider her to be a piece of ass' and that Plaintiff had potential to become a manager within a year or so 'if she would just listen to him [and comply with his demands].'" (Doc. 89 at 9.) The problem with this argument is that it mischaracterizes what Petty actually said during her deposition. Petty's account of the encounter in the walk-in cooler appears at pages 47-51 of her deposition transcript. (Doc. 88-2 at 24-28.) At no point does Petty claim that Allsworth threatened to interfere with her promotion unless she agreed to his

sexual demands. To the contrary, the transcript reveals that Petty claimed that Allsworth "kept begging [her] . . . to listen to him and . . . ," at which point Petty trailed off. (Doc. 88-2 at 27.) In response, Circle K's counsel immediately asked: "Do you remember anything else he said?" (*Id.*) Petty responded: "No. No, I don't." (*Id.*) Petty cannot avoid summary judgment by inserting, in brackets, made-up words that don't actually appear in, and contradict, her deposition testimony.

Nevertheless, even assuming that a reasonable juror could construe the text Allsworth sent to Petty immediately after the incident in the walk-in cooler (which stated that Allsworth's romantic interest in Petty "ha[d] nothing to do with" her job prospects and promotion potential, *see* Doc. 88-3 at 64) as a veiled quid pro quo offer, it was nothing more than an inchoate threat—he was terminated shortly after Petty reported his actions and Petty does not allege that he ever caused her to suffer a concrete employment action, as is required to establish a viable quid pro quo claim. *Holly D.*, 339 F.3d at 1170 ("An unfulfilled, or inchoate, quid pro quo threat by a supervisor is not enough; something more is required.").

For these reasons, Circle K is entitled to summary judgment on Count One to the extent it is premised on a quid pro quo theory.

### C. Retaliation

Circle K argues that it "is entitled to summary judgment on Ms. Petty's retaliation claim to the extent it arises from her resignation" because (1) she failed to exhaust her administrative remedies pertaining to any claim of constructive discharge and (2) she was not, on the merits, constructively discharged. (Doc. 88 at 2, 12-14.) Because the Court agrees with Circle K's first argument, there is no need to reach the second argument.[9]

---

[9] That said, Circle K's arguments concerning the second issue are strong. The Ninth Circuit "set[s] the bar high for a claim of constructive discharge because federal antidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable." *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007). Here, the fact that Petty continued working for nine months after the alleged retaliatory actions took place undermines her suggestion that the resulting conditions were extreme. *Id.* at 1185 (holding that a plaintiff who continued working for eight months was not, "[a]s a matter of law, . . .

"Under Title VII, a plaintiff must exhaust her administrative remedies by filing a timely charge with the EEOC . . . , thereby affording the agency an opportunity to investigate the charge." *B.K.B. v. Maui Police Dept.*, 276 F.3d 1091, 1099 (9th Cir. 2002). In any subsequent lawsuit, the plaintiff may pursue "all allegations of discrimination that either fell within the scope of the EEOC's actual investigation or an EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" *Id.* at 1100 (citation, emphasis, and internal quotation marks omitted). In other words, "[t]he jurisdictional scope of a Title VII claimant's court action depends upon the scope of both the EEOC charge and the EEOC investigation." *Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir. 1990).

Here, Circle K focuses on the official EEOC charge form that Petty signed on September 17, 2015 (Doc. 89-4), arguing that because the document only alleges discrimination (the box next to "retaliation" isn't checked) and because Petty never amended the document to add allegations pertaining to retaliation and/or constructive discharge, it follows that Petty can't show exhaustion. (Doc. 88 at 12 ["Ms. Petty did not check the box for retaliation in the section of the charge form titled 'Discrimination Based On' . . . [and never] amend[ed] her existing charge of discrimination after resigning from Circle K."].)

Insofar as the charge document itself goes, Circle K is correct. When determining whether a plaintiff's claims are reasonably related to the allegations in the EEOC charge, courts "consider such factors as the alleged basis of the discrimination, dates of discriminatory acts specified within the charge, perpetrators of discrimination named in the charge, and any locations at which discrimination is alleged to have occurred." *Vasquez v. Cty. of Los Angeles,* 349 F.3d 634, 644 (9th Cir. 2003). Here, only one of those factors ("any locations at which discrimination is alleged to have occurred") could support a finding that Petty's constructive discharge claim is "reasonably related" to her EEOC charge. All of the other factors cut decisively in the other direction: (1) the "alleged basis

someone who finds his working conditions so intolerable that he felt compelled to resign").

of the discrimination" is different because Petty's EEOC charge focuses only Allsworth's conduct in the walk-in cooler on September 8, 2015 and a Circle K human resource manager's perceived indifference to the incident during a meeting with Petty on September 9, 2015—it doesn't allege any retaliation by Circle K and doesn't allege that Petty was subsequently discharged; (2) the "dates of discriminatory acts specified within the charge" don't support a reasonable-relation finding because the EEOC charge only mentions events that occurred on September 8-9, 2015, nine months before the constructive discharge allegedly occurred; and (3) the only "perpetrator[] of discrimination named in the charge," Allsworth, obviously wasn't involved in any decision to constructively discharge Petty because he was fired by Circle K nine months before that decision took place.

The exhaustion analysis, however, doesn't stop with the EEOC charge form. The Court also must assess whether the current charges fall within the "scope of the EEOC's actual investigation" or an "investigation which can reasonably be expected to grow out of the charge." *B.K.B.*, 276 F.3d at 1100. Here, Petty filled out an intake form when she initially met with the EEOC on September 17, 2015. (Doc. 89-6.) In the portion of the form requiring Petty to specify "the reason (basis) for your claim of employment discrimination," Petty checked the boxes next to the words "Sex" and "Retaliation." (Doc. 89-6 at 3.) Additionally, the EEOC investigator's notes from the intake interview on September 17, 2015 include a stand-alone section entitled "Retaliation," which includes the following narrative: "[Petty] stated she is now being placed on the graveyard shift. [Petty] stated HR is constantly calling asking her if she has spoken to the police or anyone about the incident. [Petty] believes they are trying to push her to quit. . . ." (Doc. 89-5 at 3.) The record is silent as to why the EEOC didn't include these allegations in the official charge form that Petty later signed.

There is no evidence the EEOC actually pursued any retaliation-related allegations when investigating Petty's charge. Nevertheless, even assuming that the scope of the EEOC's investigation reasonably could have extended (or actually did extend) beyond Allsworth's conduct during the incident in the walk-in cooler to encompass the acts of post-

incident retaliation Petty mentioned during her intake interview, it doesn't follow that the investigation also reasonably could have been expected to encompass Petty's current claim for constructive discharge. In *Green v. Brennan*, 136 S. Ct. 1769 (2016), the Supreme Court held that when an employee wishes to pursue a Title VII-based claim for constructive discharge, the time to present that claim to the EEOC "begins running only *after* the employee resigns." *Id.* at 1774 (emphasis added). This is so, the Court held, because "in the context of a constructive-discharge claim, a resignation is part of the 'complete and present cause of action' necessary before a limitations period ordinarily begins to run." *Id.* at 1776 (citation omitted). Thus, "such a claim accrues only after an employee resigns." *Id. See also id.* at 1780 ("[An employee's] resignation . . . is not merely an inevitable consequence of the discrimination he suffered; it is an essential part of his constructive-discharge claim. That is, [an employee] could sue for constructive discharge until he actually resigned.").

In light of these principles, it was incumbent upon Petty (who was represented by counsel during the EEOC investigation) to amend her formal EEOC charge after she stopped working for Circle K in June 2016 or, at a minimum, to inform the EEOC of her new allegation that she had been constructively discharged. Her failure to do so means she cannot assert a constructive discharge claim in this case. To hold otherwise would "actively negate Title VII's remedial structure." *Green*, 136 S. Ct. at 1178.

A similar situation arose in *Villa v. Arizona*, 2019 WL 1858138 (D. Ariz. 2019). There, the plaintiff filed a charge of discrimination with the EEOC in March 2015 "alleging that he had been discriminated and retaliated against because of his sex and national origin." *Id.* at *4. More than two years later, in September 2017, the plaintiff resigned. *Id.* at *5. During the ensuing Title VII lawsuit, the plaintiff sought to assert a constructive discharge claim but the court rejected it on exhaustion grounds, holding:

> Plaintiff's constructive discharge claim [is] beyond the scope of his EEOC charge, which only contained retaliation allegations and harassment allegations regarding the terms and conditions of his employment. Plaintiff's EEOC charge is directed solely at conduct which took place while he was still working, and an investigation into this conduct would not have

encompassed his subsequent claim that he was constructively discharged. . . . [T]he allegations in Plaintiff's EEOC charge in no way express that Plaintiff believed his working conditions were so difficult that he felt compelled to resign.

*Id.* at *9 (internal citation omitted). The same logic applies here. Thus, Circle K is entitled to summary judgment on Petty's retaliation-based Title VII claim to the extent that claim is premised on a constructive discharge theory. *See also Hellman v. Weisberg*, 2007 WL 505308, *2 (D. Ariz. 2007) (plaintiff failed to exhaust her administrative remedies as to her constructive discharge claim because her EEOC charge only claimed retaliation for engaging in protected activity and she did not resign until eight months after filing the charge).

IV.    IIED Claim

Count Three of the complaint asserts state-law claims for "intentional and/or negligent infliction of emotional distress." (Doc. 1 ¶ 49.) Although the complaint identifies Allsworth as the only person who engaged in extreme and outrageous conduct, it alleges that Circle K may be held liable "vicariously" for Allsworth's conduct. (*Id.*)

In its motion, Circle K doesn't address whether, under Arizona law, an employer may be held vicariously liable for the tort of IIED. (Doc. 88 at 14.) Instead, Circle K argues that *its* conduct—responding immediately to Petty's complaint, conducting an investigation, and then firing Allsworth—was "hardly 'atrocious' or 'utterly intolerable' behavior" and thus cannot support IIED liability. (*Id.*)

The Court agrees with Circle K that the company itself did nothing that approaches conduct that could be characterized as extreme or outrageous. Thus, had Petty's IIED claim rested on that legal theory, Circle K would be entitled to summary judgment. However, the complaint makes clear that Petty is traveling under an entirely different theory, vicarious liability, and Circle K doesn't address the viability of that theory in its moving papers. Accordingly, Circle K's motion for summary judgment as to the IIED claim is denied.[10]

_____

[10]    The Court further notes that some Arizona cases seem to suggest an employer may

V.     Front and Back Pay

Circle K argues that Petty is not entitled to front or back pay on her Title VII claim because she "did not seek employment for several months after her voluntary resignation from Circle K," quit or abandoned the two jobs (at Walmart and U-Haul) she eventually obtained, and thus failed to comply with the rule that "Title VII imposes upon plaintiffs seeking back [and front] pay a duty to mitigate damages by seeking alternative employment with reasonable diligence." (Doc. 88 at 15-16, quotations omitted). In her response, Petty barely addresses this argument—her sole response is that "Plaintiff sought employment, working part-time cleaning houses. [Also], Plaintiff did testify that she was under extreme distress, and had difficulty managing her household with her emotional issues and impact on her husband and children. Such are fact issues for the jury." (Doc. 89 at 16.) In its reply, Circle K contends that Petty's house-cleaning claim is a "conclusory allegation[]" that is "unsupported" by "any evidence in the record." (Doc. 92 at 12.)

It is true that "plaintiffs seeking back pay" under Title VII have "a duty to mitigate damages by seeking alternative employment with 'reasonable diligence.' The same requirement has been used to constrain awards of front pay." *Caudle v. Bristow Optical Co., Inc.*, 224 F.3d 1014, 1020 (9th Cir. 2000) (citations omitted). However, this mitigation requirement is not, contrary to Circle K's argument, a threshold requirement that a plaintiff must satisfy in every case before being allowed to seek a front or back pay award—instead, it is merely a basis for reducing such an award. *See, e.g.*, *Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338, 1347 (9th Cir. 1987) ("It is clear that front pay awards, like backpay awards, must be reduced by the amount plaintiff could earn using reasonable mitigation efforts."). *See also id.* at 1345 ("Any wages the plaintiff actually earned after termination, plus the amount the plaintiff would have earned if he had made reasonable efforts, must be subtracted from a backpay award."). Circle K has not identified any case from the Ninth

---

be held vicariously liable for IIED when a supervisory employee engages in sexual harassment. *State, Dep't of Admin. v. Schallock*, 941 P.2d 1275, 1281-87 (Ariz. 1997) (reversing the Court of Appeals' determination that a supervisor's intentional infliction of emotional distress—caused by the sexual harassment of a subordinate—could not be within the course and scope of employment as a matter of law).

Circuit in which a court issued an across-the-board grant of summary judgment on a claim for front or back pay based on the plaintiff's failure to mitigate.

Nevertheless, Circle K is entitled to summary judgment on these claims for a different reason. In general, "[a]n employee who quits cannot secure backpay unless his employer constructively discharged him." *Satterwhite v. Smith*, 744 F.2d 1380, 1381 n.1 (9th Cir. 1984). *See also Sanchez v. City of Santa Ana*, 915 F.2d 424, 431 (9th Cir. 1990) ("An employee who resigns, as Sanchez did, cannot secure backpay unless his employer constructively discharged him.").[11] Similarly, "[t]o receive front pay, a Title VII plaintiff must show that her employer's violations of Title VII caused her loss of employment." *Gotthardt v. Nat'l R.R. Passenger Corp.*, 191 F.3d 1148, 1155 (9th Cir. 1999). Here, the Court has already determined that Petty cannot assert a Title VII claim premised on a constructive-discharge theory because she failed to exhaust that claim with the EEOC. Given this conclusion, Petty cannot recover front or back pay. *See also Kelly v. Matanuska Elec. Ass'n, Inc.*, 2010 WL 11566475, *2 (D. Alaska 2010) ("[B]ecause plaintiff has not asserted a constructive discharge claim, plaintiff is precluded, as a matter of law, from seeking back pay in connection with his hostile work environment claims.").

In a supplemental brief filed before oral argument, Petty argued that, in *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493 (9th Cir. 2000), the Ninth Circuit "rejected the argument that lost wages cannot be recovered without a finding of constructive discharge." (Doc. 100 at 6.)[12] This argument lacks merit. In *Passantino*,

---

[11]     The Ninth Circuit has recognized certain exceptions to this rule, including that a Title VII plaintiff may recover back pay, even in the absence of a constructive discharge, in refusal-to-hire cases. *Thorne v. City of El Segundo*, 802 F.2d 1131, 1134 (9th Cir. 1986) (identifying *Satterwhite* as one of the "precedents that prohibit an employee, who has been denied discriminatorily an opportunity for promotion, from collecting backpay for periods beyond that employee's voluntary resignation, unless the employee demonstrates that she was constructively discharged by the employer" but stating that because "[t]he discriminatory refusal to offer Thorne a position as a member of the police force constituted a refusal to hire . . . the doctrine of constructive discharge is inapplicable").

[12]     Under Rule 56(f)(2), the court may grant summary judgment "on grounds not raised by a party" after "giving notice and a reasonable time to respond." Here, the Court issued a tentative order concluding that Petty had failed to exhaust her constructive discharge claim (Doc. 94) and then authorized the parties to file supplemental briefs, before oral argument, addressing whether Petty would be precluded from seeking front or back pay in light of this determination (Doc. 98). In her supplemental brief, Petty cited a superseded

"[t]he district court allocated all of the compensatory damages, front pay, and backpay to Passantino's state law clam, while allocating the punitive damages to her Title VII claim." 212 F.3d at 509. Because "the damage awards involving backpay, front pay, and emotional damages were allocated to the state law claim," the *Passantino* court "analyze[d] those awards under Washington law." *Id.* at 510. Thus, *Passantino* does not address the availability of front and back pay under Title VII, much less demonstrate that Petty may recover front and back pay pursuant to her Title VII claim in this case even though she is barred (due to lack of exhaustion) from asserting a Title VII constructive discharge claim.[13]

Accordingly, **IT IS ORDERED** that:

(1)    Circle K's motion for partial summary judgment (Doc. 88) is **granted in part and denied in part**.

Dated this 13th day of March, 2020.

_____
Dominic W. Lanza
United States District Judge

_____

version of *Passantino* (Doc. 100 at 4), but the Court construes that citation as a reference to the version addressed above.

[13]    Petty has asserted two state-law claims in addition to her Title VII claim, and *Passantino* suggests that at least some states (*e.g.,* the state of Washington) allow employees to recover front and back pay, as a matter of state law, even in the absence of a constructive discharge. Nevertheless, during oral argument, Circle K stated that Petty would not be able to recover front and back pay via her state-law claims in this case because Arizona law does not permit such recovery. Because this issue has not yet been briefed by the parties, the Court takes no position on it.